## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRENDA KELLY** | :  **CIVIL ACTION** |
| | : |
| **v.** | : |
| | :  **NO. 16-618** |
| **UNIVERSITY OF PENNSYLVANIA** | : |
| **HEALTH SYSTEM** | : |

### MEMORANDUM

**KEARNEY, J.**                                                      **AUGUST 2, 2016**

An employee claiming her former long-term employer retaliated against her after years of repeated disability leave must adduce credible evidence showing the business reasons for terminating her after five steps of progressive discipline are a pretext for retaliation for repeated authorized leave.  To show her former employer discriminated against her due to a disability, she must show a causal connection between her alleged disability and the adverse employer action. When the employee does not adduce credible evidence of pretext other than her say-so for the retaliation claim or a causal connection for the discrimination claim, we enter the accompanying Order granting the former employer's motion for summary judgment.

## I.      Undisputed facts.[1]

Brenda Kelly sues her former employer University of Pennsylvania Health System ("Penn Health") for employment discrimination alleging it unlawfully terminated her employment.[2]  Kelly alleges Penn Health violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA").[3]  Kelly contends Penn Health retaliated against her for her frequent use of FMLA leave, as well as her osteoarthritis disability.[4]

Penn Health operates and manages multiple hospitals and medical facilities in the Philadelphia region.[5]  Penn Health maintains a call center where operators transfer calls to the various hospitals, provides an after-hours answering service, and activates clinical emergencies, such as "Codes" or "Rapid Responses."[6]  Penn Health employed Kelly as a Communication Specialist ("Operator") and a Lead Communication Specialist ("Lead Operator") during her tenure in the call center from February 1991 to June 19, 2015.[7]

### A.     Kelly's history of medical concerns and approved leave.

Kelly is fifty-two (52) years old with Hepatitis B and Osteoarthritis, presenting itself in 2009 resulting in her beginning to use Penn Health's FMLA leave.[8]  Penn Health also provides employees with "Other Medical Leave" ("OML"), which an employee may use after she exhausted her FMLA leave.[9]  From 2008-2015, Kelly used both FMLA leave and OML.[10]  Penn Health approved Kelly's request for varied amounts of leave each year.  From 2008-2009, Kelly took intermittent FMLA leave on 135 days.[11]  In 2010, Kelly exhausted her FMLA leave and thirty (30) days of OML.[12]  Kelly had two surgeries in 2010: one to correct displaysia in her right hip and the second to deal with infection of the wound.[13]  Kelly requested and Penn Health approved FMLA leave and OML from January 29, 2010—the date of her first surgery—to April 16, 2010; a span of two and one half months.[14]  Kelly then took an additional forty-nine (49) days of intermittent FMLA leave in 2010.[15]

In 2011, Kelly exhausted her FMLA leave and fifty-three (53) days of OML.[16]  Kelly received three surgeries on her hip in 2011.[17]  The first two surgeries occurred on February 14, 2011 and March 31, 2011.[18]  Kelly requested and Penn Health approved FMLA leave and OML from January 14, 2011 to May 13, 2011: a period of four months.[19]  The third surgery occurred on August 16, 2011, but Penn Health denied Kelly's request for FMLA leave from June 28 to

September 28, 2011.[20]   Between 2012 and 2013, Kelly took intermittent FMLA leave on 140 days.[21]

In 2014, Kelly exhausted her FMLA leave and fifty-one (51) days of OML.[22]   In 2014, Kelly requested and Penn Health approved large blocks of FMLA leave and OML due to her medical condition.[23]   Kelly had another surgery for her hip on July 15, 2014.[24]   Kelly subsequently had surgery for her hip on August 18, 2014 to drain her wound from the previous surgery.[25]   Kelly took consecutive leave from June 2, 2014 to June 15, 2014.[26]   Kelly then took FMLA leave and OML from July 14, 2014 to October 14, 2014.[27]   Kelly's physician certified her to return to work on October 14, 2014.[28]   In November 2014, weeks after returning to work, Kelly emailed her supervisor Sophie Douglas, requesting accommodations:

1) The ability to come to work late when in pain;
2) The ability to leave work early when in pain; and
3) The ability to walk around to avoid stiffness and pain caused by the Osteoarthritis.[29]

Douglas forwarded Kelly's email to Human Resources Manager Joann Crowley explaining she spoke to Kelly and:

> She is the Lead and her [t]ime on the phone is less than the operators. We take in to consideration that the Leads perform Lead duties, so we allow flexibility. She is able to get up and stretch and mobilize her joints because we understand. As far as leaving early and coming in late, she does not have any more FMLA. Brenda, needs to be monitored carefully because she is the individual that left (FMLA) early on several occasions because she needed a ride from a co-worker. She said she had doctor's appointments but it was because she does not have a car. Also, the leads are due to rotate so she will be a Presby Lead and that group operation is not as intense as HUP. If she is not fully recovered, she may need to go out on long term disability.

> Also, if feasible, Tammy will try and work with her is she need to take vacation time.[30]

After conferring with Crowley, Douglas partially granted Kelly's request: 1) a chair that will support her hips; 2) a foot stool; 3) allowing Kelly to walk around if joints are stiff; and 4)

3

supervising the Presbyterian operators, which is not as labor intense.[31] While unable to allow Kelly to leave early and come in late, Douglas states, "Tammy [Stewart] will try her [ ] best to honor a vacation request if it is operational feasible."[32]

In 2015, Penn Health approved Kelly for limited intermittent FMLA leave on sixteen (16) days stretching from April to June.[33] On February 12, 2015, Kelly requested FMLA leave.[34] It is unclear the dates for which she requested the leave and whether Penn Health granted the leave.[35]

### B.    Kelly's discipline history at Penn Health.

Penn Health uses a Performance Improvement and Progressive Steps ("PIPS") plan to "address concerns relating to individual employee performance, violations of [Penn Health] rules, policies, safety practices, and standard or professional conduct, and employee attendance and timeliness."[36] The PIPS plan consists of a five-step disciplinary program.[37] The first step is a "Coaching", which is an "ongoing, informal process through which the manager articulates models and reinforces expected performance and addresses (a) performance deficiencies, (b) violations of rules, policies, safety practices and standards of professional conduct, and (c) attendance and lateness infractions."[38] The next level is a "First Written Warning" "initiated by the manager in the event of ongoing performance problems, more serious violations, recurrence of prior violations, or persistence of attendance or lateness infractions." [39] In the event of "persistent performance problems"—following a First Written Warning in the previous 12 months—the manager may issue a "Second Written Warning".[40]    If the employee's deficiencies have not been rectified, or the employee commits a "very serious violation" while on a Second Written Warning, the manager may then issue a "Final Warning".[41] At this point, "any further performance deficiency or violation, of any kind or magnitude, during the next twelve month

4

period will result in immediate termination of employment."[42]

Penn Health issued Kelly's First Written Warning on April 29, 2014, for "fail[ing] to submit a completed physician's certification" accompanying her FMLA request.[43]   Kelly's signature appears on the First Written Warning.[44]   On December 5, 2014, Penn Health issued Kelly's Second Written Warning for unprofessional conduct because she failed to cooperate with an Operator seeking to obtain information about a code response.[45]   Kelly argues she did not engage in the unprofessional conduct, Penn Health did not present her with the warning, and she testified someone forged her signature on the warning.[46]

Penn Health issued Kelly her Final Written Warning on February 20, 2015, for failing to properly follow the call-out procedure multiple times.[47]   Douglas claims Kelly violated procedure on February 1, 2015, by texting a co-worker who was not the Lead Operator on the shift at the time, to inform her she would not be coming to work and Kelly previously texted another employee—who had a scheduled day off—to report herself out on January 27, 2015.[48] The Final Warning explained Kelly must verbally call out by calling the Lead Operator on the shift.[49]   Penn Health emailed Kelly on February 10, 2015, informing her she would receive counseling for the violation but Kelly denies receiving the email.[50]   The Final Warning states Kelly refused to sign the Final Warning, which was witnessed by another employee.[51]   At her deposition, Kelly testified she did not refuse to sign the document because she never saw the document until she went to her unemployment arbitration after her termination.[52]   She also denies the incident ever occurred.[53]

On March 6, 2015, Douglas emailed Crowley reporting Kelly made an unprofessional statement to a co-worker: "I hate HUP operators and that is what she (implying Carliece) get for messing with my girlfriend (Adriane)."[54]   Kelly allegedly made this statement the day after

5

Carliece received counseling for making an "abrupt statement to Adriane".[55]   Penn Health's
Douglas stated she would "like to counsel Brenda because it appears that she is trying to taunt
Carliece".[56]  Crowley responded to the email:

> Sophie—since she is at Final WW, are you asking if we can terminate her? I don't
> think we can for this situation; however, why is she being kept in a Lead role
> when she is clearly not demonstrating leadership behavior?[57]

Sophie replied her and her supervisor did not "desire for [Kelly] to be in a Lead position" but
they were unsure whether she could be demoted.[58]   On March 25, 2015, Crowley told Douglas,
"If you and Amy agree that Brenda no longer exhibits the behavior you expect in a Lead
Operator, then you can demote her back to an Operator . . . We do not recommend a salary
decrease."[59]  On March 16, 2015, Tammy Stewart, the information coordinator, emailed Douglas
informing her Kelly again failed to follow proper call-out procedure by not calling the Lead
Operator.[60]   It is not clear if Kelly received discipline as a result of this conduct, however,
Douglas did forward the email to Crowley before her March 25, 2015 email.[61]  Effective March
29, 2015, Penn Health demoted Kelly from Lead Operator to Operator but did not decrease her
salary.[62]

On June 15, 2015, Kelly was on her work telephone with her husband when an
emergency Rapid Response request came through to her line.[63]  Because Kelly was on the phone
with her husband, she used the back-up system to send the Rapid Response Announcement to the
hospital. [64]  Kelly sent the Rapid Response Announcement to the wrong hospital by entering the
incorrect hospital code.[65]  On June 19, 2015, Penn Health terminated Kelly because, at the time
of her error on June 15, 2015, Kelly was on her Final Warning with the next step being
termination.[66]

II.    **ANALYSIS**[67]

A.    **Kelly cannot show pretext necessary for FMLA retaliation.**

Congress prohibits interference with FMLA rights and retaliation for exercising these rights.   An employee may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" granted under the FMLA.[68]   Kelly argues under the "retaliation" provision providing an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA.[69]

Kelly's FMLA retaliation claim based on circumstantial evidence is governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[70]   First, Kelly must establish a *prima facie* case by showing 1) she invoked her right to FMLA leave; 2) she suffered an adverse employment action; and 3) a causal connection between the adverse employment action and her invocation of rights.[71]   If established, the burden shifts to Penn Health to proffer a legitimate non-discriminatory reason for the adverse employment action.[72]   If Penn Health meets this "minimal burden", the burden returns to Kelly  who "must point to some evidence that [Penn Health's] reasons for the adverse action are pretextual."[73]

i.    **Kelly establishes a causal connection between her FMLA leave and her termination.**

Penn Health argues Kelly cannot establish a *prima facie* case because there is no causal connection between her FMLA leave and Penn Health's adverse action.   It argues Kelly's error with regard to the Rapid Response Announcement breaks the causal connection between her FMLA leave and Penn Health's terminating her employment.[74]   Additionally, Penn Health contends its grant of Kelly's FMLA leave requests over the previous six (6) years negates an inference of discrimination.   To establish a causal connection Kelly must show either " '(1) an unusually suggestive temporal proximity between the protected activity and the allegedly

7

retaliatory action, or (2) a pattern of antagonism coupled with timing [,] to establish a causal link.'"[75]

Kelly offers an unconvincing case there is an unusually suggestive temporal proximity to support a causal connection. Kelly contends when she returned from her three-month consecutive leave in October 2014, Penn Health issued discipline which she alleges to be pretextual.[76] The discipline arising from her refusal to cooperate with an Operator's documentation of a code announcement occurred almost two (2) months after her return.[77] Then, more than two (2) months later, during which Kelly did not take any FMLA leave, Penn Health disciplined her for failing to follow proper call-out procedure on February 20, 2015.[78] Penn Health demoted Kelly to Operator on March 29, 2015, five (5) months after returning from leave.[79] Penn Health then terminated her employment on June 19, 2015, eight (8) months after she returned from consecutive leave.[80] We find no unusually suggestive timing.

In the alternative, Kelly argues Penn Health's discipline before her termination, as well as comments she contends Douglas and Stewart made regarding FMLA leave, represents a pattern of antagonism directed at her for taking FMLA leave. Construing the facts in the light most favorable to Kelly, a factfinder may reasonably find a causal connection between terminating Kelly and her FMLA leave. While much of what Kelly cites is not particularly relevant, there is some evidence of antagonism towards Kelly. The record as a whole suffices to create a genuine issue of material fact as to a causal connection.[81] For example, Crowley testified both Douglas and Stewart complained to her about employees taking intermittent FMLA leave and the difficulty of scheduling when that happens.[82] As Kelly takes frequent intermittent FMLA leave, a reasonable factfinder could conclude the two had an antagonistic attitude towards those taking FMLA leave. Douglas wrote to Crowley suggesting Kelly needed to be "monitored more

8

carefully" with regard to her FMLA leave.[83]   Kelly testified Douglas told her she was a "great employee" and "did a very good job" but that she was "out too much."[84]   Kelly also testified Stewart told her that "everyone was out" because she "was out" so often.[85]   These facts, coupled with the discipline issued to Kelly in the time between her return from leave and her demotion and termination and Kelly's testimony regarding Douglas' and Stewart's attitude toward her after her return from leave, could lead a reasonable factfinder to conclude a causal connection exists.[86]   The evidence, while not overwhelming, is sufficient to establish a *prima facie* case.[87]

**ii.      Penn Health's legitimate non-discriminatory reason for terminating Kelly's employment.**

Penn Health offers a legitimate non-discriminatory reason for terminating Kelly's employment.   Kelly accumulated three (3) written warnings placing her on her Final Written Warning on the PIPS plan.   When Kelly sent the Rapid Response Announcement to the wrong hospital, the next step in the PIPS plan is employee termination.[88]   This explanation meets the relatively light burden placed on employers at this stage.

**iii.      Kelly cannot adduce credible evidence of pretext.**

To establish pretext, Kelly must show direct or circumstantial evidence from which a reasonable factfinder could reasonably either (1) disbelieve Penn Health's articulated reason, or (2) believe an invidious discriminatory reason was more likely than not the determinative cause of Penn Health's action.[89]   "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[90]   Instead, Kelly "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Penn Health's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them

9

'unworthy of credence.'"[91]

Though she establishes a *prima facie* case, Kelly cannot cite evidence sufficient to show Penn Health's reasons for her demotion and termination were pretextual.[92]  Kelly attempts to paint the narrative as Penn Health, through Douglas and Stewart, becoming disenchanted with Kelly because she took a three-month long consecutive leave in 2014, and may possibly require consecutive leave in the future.[93]  She contends termination requires a "drastic shift" in her performance, and absent such a drastic shift, the only plausible explanation for her termination is discrimination.[94]  Kelly cites her past positive performance reviews as evidence.[95]  Kelly argues it is "extremely suspicious that an employee holding a position for such a long period of time would have such a sudden and drastic shift in her performance".[96]  But previous positive reviews do not contradict Penn Health's documented evidence of her performance issues leading to demotion and termination.[97]

Kelly then argues Douglas only considered demoting Kelly or terminating her employment after she returned from her consecutive leave.[98]  But Kelly fails to cite any timeline. Kelly returned to work in October 2014 and Douglas did not consider demoting her until March 2015, after Kelly received discipline while on a Final Written Warning.  Kelly attempts to lump all of Penn Health's conduct together without differentiating it by date.  She contends "the first time demotion ever came up was in 2015 after her extensive medical leaves, after she informed Ms. Douglas about the exact nature of her condition and limitations associated with that condition, after she requested accommodation and after she informed Ms. Douglas that she would require additional surgeries."[99]  But each of these events occurred in November 2014 or earlier.[100]  This timing cuts against pretext.  Douglas only considered demotion after Kelly's incident of alleged unprofessional behavior while on her Final Written Warning in the PIPS plan.

10

Moreover, Douglas only considered demotion after Crowley suggested the idea.[101]   Douglas did testify she believed termination would be proper because "it was the next level of discipline."[102]

Kelly also attempts to "infer" Penn Health inflated her performance issues hoping to support a decision terminating her.[103]   Kelly refers to Douglas' statements regarding Kelly's "pattern" of unprofessional behavior and then refers to Douglas testifying the incident for which she demoted Kelly involved Kelly taunting another worker named Carliece.[104]   Kelly contends this is an inconsistency in the reason given for the demotion. But the record, which Kelly fails to cite, reveals no inconsistency.[105]   After the incident, Kelly emailed Douglas stating she would like to counsel Kelly for the event.[106]   The next step in the PIPS plan was termination but rather than terminating Kelly, they demoted her with the same pay.[107]   There seems nothing inconsistent about this. Kelly's argument about inconsistent reasons boils down to an attempt to cast Penn Health's decision to demote her as too grave of a disciplinary action. But challenging an employer's decision that an incident is serious enough for a given disciplinary action does not support an inference of pretext.[108]

Kelly also argues the "ultimate fact issue in the case" is her contesting the basis of the discipline.[109]   Kelly denies the performance concerns.[110]   Her argument fails for multiple reasons.

Implicit in Kelly's argument is her continued belief Penn Health forged her signatures on the First and Second Written Warnings. While seemingly now abandoning this argument, Kelly testified she never saw those warnings and alleges Penn Health forged her signature.[111]   After her deposition, Penn Health hired a handwriting expert to compare signatures contained on First and Second Warnings, as well as nine (9) documents containing "known signatures of Brenda Kelly."[112]   The expert, without any rebuttal evidence from Kelly, opined to the highest degree of confidence the signatures on the First and Second Warning were written by Kelly.[113]   Under the

11

"Standard Terminology for Expressing Conclusions of Forensic Document Examiners", the expert concluded Kelly "wrote" the questioned signatures.[114] Kelly did not challenge the report of the expert, and did not rely on the forgery argument in her Opposition. We find the report substantial enough to disregard any self-serving testimony to the contrary.[115]

There is no evidence cited by Kelly supporting her general denial of the conduct in the various warnings. Kelly cites to *Treaster v. Conestoga Wood Specialties, Corp.*[116], for the theory courts are to deny summary judgment where the plaintiff disputes the conduct at issue. In *Treaster*, plaintiff presented evidence challenging the claimed reason for termination.[117] Kelly offers no basis to dispute the disciplined conduct other than her say-so. The best she can do is an affidavit from a co-worker, who according to Penn Health and Kelly, is suing Penn Health for race discrimination and who is represented by Kelly's counsel.[118]   Bias aside, Jeanmarie Briscella's certification does not move the needle. [119] Ms. Briscella does not have first-hand knowledge of Kelly's previous written warnings and admits Kelly sent the code to the wrong hospital.[120] Ms. Briscella's certification contains general allegations concerning the environment in the call center, as well as conclusory comparator evidence.[121]  Briscella avers she was present on June 15, 2015, when Kelly sent the Rapid Response Announcement to the wrong hospital. She contends this is a common mistake and often occurs without consequence.[122]  But neither Kelly nor her provide comparators and do not allege they were similarly situated, both of which are required at the summary judgment stage.[123]   Kelly also testified she had knowledge of comparators but could not testify these employees committed the same infraction, were not disciplined, or were at the same level of the PIPS plan when or if they committed any infraction.[124]

Finally, Kelly contends her FMLA usage changed in 2014 to require more consecutive leave and knowing this, Penn Health sought to terminate her. The record belies her argument. In 2010 and 2011, Kelly took consecutive FMLA leave and OML of two and one half months, and four months, respectively, compared to the three-month leave taken in 2014.[125] To suggest her leave schedule radically changed in 2014 causing angst among the supervisors is disingenuous given she had taken leave in an even larger block of time just before. Nonetheless, Kelly's claim Douglas was antagonistic towards her because she would need large blocks of leave in the future is entirely speculative as Kelly never took any consecutive leave before her demotion or termination and, in fact, continued to successfully invoke intermittent FMLA leave before her termination.

Kelly's evidence consists of stray remarks, past positive reviews, and unspecific comparator evidence. These assertions are insufficient to create a genuine issue of material fact as to pretext after fulsome discovery. We grant summary judgment to Penn Health on Kelly's FMLA retaliation claim in the accompanying Order.

## B.     Kelly does not adduce evidence of ADA discrimination.[126]

Kelly also sues Penn Health for discriminating against her due to her disability. The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.[127]

"A 'qualified individual with a disability' is a person 'with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"[128]  To establish a *prima facie* case of ADA discrimination, a

13

plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."[129]

A person qualifies as disabled under the ADA if she (1) has a physical or mental impairment that substantially limits one or more of her major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.[130]   The ADA defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending . . . and working." Despite Kelly stating she is not disabled, we cannot accept it as a concrete truth.  It is entirely likely a non-legally trained party may have an understanding of the term "disability" inconsistent with the ADA.  Accordingly, such a legal conclusion by Kelly does not necessarily prevent her from showing she is disabled.[131]   We believe there is at least a genuine issue of material fact concerning Kelly's disability.

Penn Health does not dispute Kelly is "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations."  However, Kelly fails to create a genuine issue of material fact with regard to the third *prima facie* element: she suffered an adverse employment action *as a result of discrimination.*  Kelly must "prove that they were treated differently based on the protected characteristic, namely the existence of their disability."[132]   "This requires a showing that the disability 'played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'"[133]   Kelly conflates her FMLA retaliation and her ADA discrimination evidence to show Penn Health discriminated against her.  Of course, some evidence may be useful in both

14

analyses but Kelly does not attempt to differentiate when Douglas or Stewart was antagonizing her for taking FMLA leave or for having a disability. It is common sense an employee, as Kelly did, will use FMLA leave when they have a disability or are sick. But the fact remains Penn Health granted some portion of Kelly's accommodations request where feasible, and promised to work with Kelly in the future to provide her the ability to use remaining vacation time for days off in the future. Kelly cannot point to direct or circumstantial evidence of discrimination based on her disability.

Nevertheless, even if we were to find Kelly could meet her *prima facie* burden, her claim fails because for the same reasons she cannot show pretext in the FMLA context, she cannot meet her burden to show Penn Health terminated her employment as pretext for disability discrimination.

### C.    ADA Retaliation

Kelly also sues Penn Health for retaliating against her in violation of the ADA. To establish an ADA retaliation claim requires Kelly show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[134]

Because Kelly cannot show Penn Health's reasons for demotion and termination are pretext for retaliation for her requesting an accommodation or simply being disabled, Penn Health is entitled to summary judgment on this claim.

### III.    CONCLUSION

We grant summary judgment in favor of Penn Health on all of Kelly's claims. While Kelly established a *prima facie* case of FMLA retaliation she is unable to show Penn Health's

15

reasons for her demotion and termination were pretext for FMLA retaliation. Her additional claims under the ADA suffer from the same defects and because we construe the PHRA alongside the ADA her PHRA claim must fail as a matter of law as well.

---

[1] The Court's Policies require the movant file a Statement of Undisputed Material Facts ("SUMF") in support of a Fed.R.Civ.P. 56 motion, as well as an appendix of exhibits or affidavits. Penn Health filed its SUMF at ECF Doc. No. 20-2 ("Def.'s SUMF"). Plaintiff responded to the Defendant's SUMF at ECF Doc. No. 22-1, referred to as "Pl.'s SUMF." References to exhibits in the appendices shall be referred to by Bates number, for example, "A at 1."

[2] Def.'s SUMF, at ¶ 57

[3] Kelly also brought a claim for FMLA interference in her complaint. Kelly amended her complaint to include claims under the ADA for failure to accommodate.

[4] ECF Doc. No. 19, at ¶¶ 1, 31 & 37.

[5] Def.'s SUMF, at ¶ 6.

[6] A. at 341; Def's SUMF, at ¶ 3.

[7] Def.'s SUMF, ¶¶ 1-2.

[8] *Id.* at ¶¶ 7, 27; A. at 196.

[9] Def.'s SUMF, at ¶ 7

[10] A. at 107-115.

[11] Def.'s SUMF, at ¶ 15; A. at 113-15.

[12] Def.'s SUMF, at ¶ 16; A. at 112-13.

[13] A. at 527-40.

[14] *Id.* at 113.

[15] *Id.* at 112.

[16] Def.'s SUMF, at ¶ 17; A. at 112.

[17] A. at 555-67.

[18] *Id.*

[19] *Id.* at 112.

[20] *Id.*

[21] Def.'s SUMF, at ¶ 18; A. at 109-10.

[22] Def.'s SUMF, at 19; A. at 107-09.

[23] Pl.'s SUMF, at ¶ 19.

[24] A. at 623.

[25] *Id.* at 635.

[26] *Id.* at 108.

[27] *Id.* at 107.

[28] *Id.* at 482.

[29] *Id.* at 503.

[30] *Id.* at 502-03.

[31] *Id.* at 504.

[32] *Id.*

[33] Def.'s SUMF, at ¶ 20; A. at 107.

[34] A. at 507-08.

[35] *Id.*

[36] Def.'s SUMF, at ¶ 35; A. at 95.

[37] A. at 99-102.

[38] *Id.* at 99.   The PIPS plan provides examples where a "single occurrence" results in a

"coaching":

  a) Presence in unauthorized areas;
  b) Unauthorized use of [Penn Health] mail, phones, equipment, computers or supplies for personal business;
  c) Personal use of cell phones or other personal communications devices while on duty;
  d) Failure to wear proper [Penn Health] ID badge;
  e) Disregard of [Penn Health] standard regarding one's appearance, uniform, dress or personal hygiene;
  f) Selling or advertising sale of merchandise, tickets, or services without authorization; and
  g) Unauthorized solicitation for a charity or cause.

[39] *Id.* at 100.

[40] *Id.* at 101.

[41] *Id.* at 101.

[42] *Id.*

[43] A. at 128. An example of a violation which would result in a First Written Warning is "failure to submit completed leave of absence paperwork within required time frame." (A. at 100.)

[44] *Id.*

[45] *Id.* at 129-30.

[46] Pl.'s SUMF, at ¶ 44; A. at 235. While Kelly testified as to forgery, her lawyer does not present this argument.

[47] A. at 131.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 175, 215.

[51] The parties have not identified the witness.

[52] *Id.* at 213.

[53] *Id.*

[54] *Id.* at 176.

[55] *Id.*

[56] *Id.*

[57] *Id.* at 509.

[58] *Id.*

[59] *Id.* at 514.

[60] *Id.* at 177.

[61] *Id.*

[62] *Id.* at 178.

[63] Def.'s SUMF, at ¶ 52.

[64] *Id.* at ¶ 54; A. at 232.

[65] Def.'s SUMF, at  ¶ 55.

[66] A. at 181.

[67] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[68] 29 U.S.C. § 2615(a)(1).

[69] *Id.* at § 2615(a)(2); 29 C.F.R. § 825.220(c).

[70] 411 U.S. 792 (1973); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2014).

[71] *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (citation omitted).

[72] *Id.*

[73] *Id.*

[74] ECF Doc. No. 20-1, at 5-10

[75] *Budhun*, 765 F.3d at 258 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[76] ECF Doc. No. 22, at 6.

[77] A. at 129-30, 482.

[78] Kelly argues she requested FMLA leave on February 12, 2015, Penn Health issued the discipline on February 20, 2015 and this is "extremely suggestive and suspicious." (ECF Doc. No. 22, at 6) Kelly fails to note Douglas and Crowley both made the discipline decision prior to her February 12 request. (A. at 131, 510-11.)

[79] *Id.* at 178.

[80] *Id.* at 181.

[81] *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

[82] A. at 309-10.

[83] *Id.* at 502-03.

[84] *Id.* at 256.

[85] *Id.*

[86] Penn Health argues Kelly's disciplined acts break a causal connection between her protected activity and her demotion and termination and its approval of her numerous FMLA leave requests without consequence negates any connection between her most recent leave and her demotion and termination. Both arguments are well-taken but neither is dispositive at this stage.

[87] Construing the facts in the light most favorable to Kelly, these comments contribute to her *prima facie* case. But their probative value is dependent on their temporal proximity to the

demotion or termination decision. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or decisionmakers unrelated to the decision process are rarely given weight, particularly if they were made temporally remote from the date of decision.").

[88] A. at 181.

[89] *Fuentes v. Perksie*, 32 F.3d 759, 764 (3d Cir. 1994).

[90] *Id.* at 765 (citation omitted).

[91] *Id.*

[92] Kelly does not cite the record for her pretext argument.

[93] In addition to the reasons discussed below, this theory is unsound because Douglas and Stewart expressed their frustration with the level of intermittent, not consecutive, FMLA leave taken and the burden it placed on them in scheduling shifts. (A. at 309, 311.)

[94] ECF Doc. No. 22, at 11.

[95] *Id.* at 12.

[96] *Id.* at 11.

[97] *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005); *Parson v. Vanguard Grp.*, No. 15-3942, 2016 WL 3878165, *6 (E.D. Pa. July 18, 2016).

[98] ECF Doc. No. 22, at 11-12.

[99] *Id.*

[100] A. at 116-18, 482; Pl's SUMF, ¶ 24.

[101] A. at 509.

[102] *Id.* at 370.

[103] ECF Doc. No. 22, at 12.

[104] *Id.*

[105] *Id.* at 510.

[106] *Id.*

[107] *Id.* at 178.

[108] *Martin v. Health Care & Ret. Corp.*, 67 F. App'x 109, 113 (3d Cir. 2003) (citing *Fuentes*, 32 F.3d at 765 (an imprudent decision does not show pretext)).

[109] ECF Doc. No. 22, at 13

[110] *Id.*

[111] Def.'s SUMF, ¶¶ 42, 44

[112] A. at 132-171.

[113] *Id.* at 134.

[114] The expert's report defines "wrote":

"Identification (definite conclusion of identity – this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

ASTM International Standard E- 1658-08.

[115] *Gonzalez v. Secretary of Dep't of Homeland Sec., 678 F.3d 254*, 264 (3d Cir. 2012) ("The circumstantial evidence offered by the [defendant] undermines and outweighs [the plaintiff's] claim of ignorance, such that this is a case where the court, based on all of the evidence, can say with confidence that a rational trier of fact could not credit the claimant's denial.")

[116] No. 09-632, 2010 WL 2606479, *24 (M.D. Pa. Apr. 29, 2010).

[117] *Id.* ("The plaintiff has pointed to evidence from which a reasonable trier of fact could conclude that the defendant did not rely on the threats purportedly heard by Jury and Blewett.").The remaining cases from outside of this Circuit are similarly distinguishable.

[118] A. at 250, 475-80.

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Id.* at 475-80, ¶¶ 26-28.

[123] *Calero*, 2012 WL 2547356, at * 14.

[124] A. at 258.

[125] A. at 112-13.

[126] Because we construe the PHRA in accord with ADA, we only discuss the ADA claims. *McFarlan v. Ivy Hill SNF, LLC*,675 F.3d 266, 274 (3d Cir. 2012) (citations omitted). We note some district courts in this Circuit have not interpreted the two conterminously with regard to what constitutes a disability because the PHRA has not been amended since the ADA's amendment in 2009. *See Szarawara v. Cnty. of Montgomery*, No. 12-5714, 2013 WL 3230691, *2 (E.D. Pa. June 23, 2013); *Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc.*, No. 10-3694, 2012 WL 1758187, *3 n.3 (E.D. Pa. May 17, 2012). The 2009 Amendments "relaxed the ADA's standard for disability" but since we find Kelly cannot show pretext, the two can still be analyzed together. *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014).

[127] 42 U.S.C. § 12112(a).

[128] *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (quoting 42 U.S.C. § 12111(8)).

[129] *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

[130] *Ramage v. Rescot Sys. Grp., Inc.*, 834 F. Supp. 2d 309, 318 (E.D. Pa. 2011) (citation omitted).

[131] In arguing Kelly admitted to not being disabled, Penn Health cites a case from the Eastern District of Texas, affirmed by the Fifth Circuit in a non-precedential opinion. *Bennett v. Calabrian Chems. Corp.*, 324 F. Supp. 2d 815, 829 (E.D. Tex. 2004), *aff'd* 126 F. App'x 171 (5th Cir. 2005). We find the Fifth Circuit's case factually distinguishable as the plaintiff suffered from a short-term impairment corrected by surgery. Kelly suffers from seemingly chronic osteoarthritis, which she contends, and we believe a reasonable jury could find, makes her disabled under the ADA.

[132] *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013).

[133] *Moore v. CVS Rx Servs., Inc.*, 142 F. Supp. 3d 321, 346  (M.D. Pa. 2015) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 n.4 (3d Cir. 2007)).

[134] *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Tyson v. Access Servs.*, No. 15-4653, 2016 WL 304862, *4 (E.D. Pa. Jan. 25, 2016).